**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALEXANDER G.,** | : | |
| *through his parents Stephen G. and* | : | |
| *Sheila G.,* | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 20-131** |
| | : | |
| **DOWNINGTOWN AREA SCHOOL** | : | |
| **DISTRICT**, | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM**</u>

**Kenney, J.**                                                        **April 26, 2021**

Alexander G. ("Plaintiff" or "Alec"), a minor child with disabilities, and his parents, Steven G. and Sheila G. ("Parents") (collectively "Plaintiffs"), filed a Motion for Judgment on the Administrative Record (ECF No. 12), requesting this Court reverse the Administrative Due Process Hearing Officer's ruling that (1) their Due Process Complaint was untimely filed, and (2) Defendant Downingtown Area School District ("Defendant" or the "District") provided Alec a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*,. and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  ECF No. 13.  Following the Plaintiffs' motion to bifurcate the proceedings so that the Court would first determine whether the Due Process Complaint was untimely filed (ECF No. 18), the Court partially denied Plaintiffs' Motion for Judgment on the Administrative Record, finding that the Hearing Officer did not misapply the statute of limitations. ECF Nos. 25 and 26. Following oral argument on the remaining issues, the Court will now rule on whether the District provided Alec a FAPE.

## I.  **FACTUAL BACKGROUND**

Alec attended parochial school beginning in kindergarten, during which time his reading skills were evaluated on two occasions. ECF No. 3-1 ¶¶ 1–2.[1] In August 2015, prior to the start of Plaintiff's fourth-grade year, the Parents asked the District to conduct a full evaluation of Plaintiff. *Id*. ¶ 3. The District completed an initial evaluation report on October 19, 2015, finding that Plaintiff was eligible for special education under the classification of a specific learning disability in reading. *Id*. ¶¶ 4–6. That report also found that Alec demonstrated cognitive functions in the average range. *Id.* ¶ 5. In January 2016, midway through Plaintiff's fourth-grade year, the Parents removed him from the parochial school and enrolled Plaintiff in the District. *Id.* ¶ 8. Shortly after beginning in the District, Plaintiff was given benchmark testing and his initial proposed Individualized Education Program ("IEP") was revised to include this updated information. *Id*. ¶ 9. The IEP team met several times between November 2015 and the end of the 2015-2016 school year. *Id*. ¶ 10. After enrolling in the District, Alec's time in special education increased from an itinerant level to a supplemental level. *Id.*

At the start of fifth grade, in 2016, the District assessed Plaintiff for a reading program that would address Plaintiff's needs and selected "Just Words." *Id*. ¶¶ 11–12. In September 2016, the Parents expressed concern with Plaintiff's progress in reading, writing, and math and requested that the District conduct a reevaluation. *Id*. ¶ 16. Defendant produced the reevaluation report in December 2016, which found that Alec continued to be eligible for education services

---

[1] ECF No. 3-1 refers to the Hearing Officer's Final Decision and Order, which includes Findings of Fact. "Factual findings from the administrative proceedings are to be considered prima facie correct." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). "A federal district court reviewing the administrative fact finder in the first instance is . . . required to defer to the [administrative law judge's] factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." *Id.*

and continued to display a need for specially designed reading instruction. *Id*. That same month, the IEP team convened to develop a new annual IEP and decided to add additional supports for math. *Id*. ¶ 18.

During his fifth-grade year, Plaintiff showed progress in all areas of reading. *Id*. ¶ 19. When the IEP team met in May and June 2017 to review Plaintiff's IEP for the sixth-grade year, the Parents advocated strongly for Plaintiff's proposed reading fluency goal to be changed to read that Plaintiff would read fluently on grade level by the end of sixth grade. *Id*. ¶ 22. Although the District did not believe that was realistic, the District revised the goal. *Id*. The sixth grade IEP team reconvened for an annual revision in late November 2017. *Id*. ¶ 45. At that time, the Parents requested an independent education evaluation. *Id*. The Parents and the District received the results of the independent education evaluation on June 12, 2018. *Id*.

On August 10, 2018, the Parents expressed their belief that the program for Plaintiff was not appropriate and provided Defendant with written notice of their intent to place Plaintiff in a private school and seek tuition reimbursement in the event they could not agree on Plaintiff's IEP at the upcoming IEP meeting. *Id*. On August 13, 2018, the IEP team convened to review the independent evaluation and to revise Plaintiff's IEP in preparation for seventh grade. *Id*. ¶ 57. On September 26, 2018, the IEP team reconvened and revised Plaintiff's seventh grade IEP. *Id*. ¶ 66. Following the August 2018 IEP meeting, the Parents decided to place Plaintiff at a private school for seventh grade. *Id*. ¶ 74.

## II. <u>PROCEDURAL HISTORY</u>

The Parents filed a Special Education Due Process Complaint on March 15, 2019 seeking compensatory education for Defendant's alleged violations of the IDEA and Section 504 for the entire time Plaintiff was enrolled in the District. ECF No. 1 ¶ 3; ECF No. 3-34. Following an

evidentiary hearing held specifically to address the "knew or should have known" date for purposes of the IDEA statute of limitations, the presiding Hearing Officer found that the Due Process Complaint was untimely filed and limited Plaintiff's claims to those accruing after March 15, 2017, two years prior to the date the parents filed the Due Process Complaint. ECF No 1 ¶ 5; ECF No. 4 ¶ 5. After a second hearing, the presiding Hearing Officer determined that the District provided Plaintiff with a FAPE and concluded Plaintiff was not entitled to compensatory education or tuition reimbursement. ECF No. 3-1 at 19.

Plaintiff then filed a Complaint in this Court pursuant to the IDEA, 20 U.S.C. § 1400, *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Chapters 14 and 15 of the Pennsylvania Code (ECF No. 1) and a Motion for Judgment on the Administrative Record (ECF No. 12), requesting the Court reverse the Hearing Officers' findings that the IDEA statute of limitations restricted Plaintiffs' claims to those accruing after March 15, 2017 and that the District had provided Plaintiff with a FAPE.

Plaintiff moved to bifurcate its proceedings so the Court could initially decide whether the Hearing Officer erred in ruling that the statute of limitations barred recovery prior to March 15, 2017 before deciding whether Defendant had provided Plaintiff with a FAPE. ECF No. 18. Because there was no opposition from Defendant, this Court granted Plaintiff's Motion to Bifurcate and decided to rule on the statute of limitations issue before determining any further issues. ECF No. 21. The Court held oral argument on the statute of limitations issue only. ECF No. 24. On December 18, 2021, the Court upheld the Hearing Officer's statute of limitations decision. ECF Nos. 25 and 26.

Presently before the Court is the issue of whether Alec was denied a FAPE and, if he was, whether the Court should award him a compensatory education, private school tuition, and reimbursement for a private speech and language evaluation.

### III. <u>JURISDICTION AND STANDARD OF REVIEW</u>

The Court has jurisdiction to review the decision of the state educational agency under 20 U.S.C. § 1415(i)(2).

In considering a challenge to a hearing officer's decision on an IDEA claim, district courts employ a "modified de novo" standard of review. *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). District courts may reach different decisions than a hearing officer but must accord the decision of the hearing officer "due weight." *Carlisle Area Sch. Dist. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 524 (3d Cir. 1995). Under this standard, the hearing officer's factual findings "are to be considered prima facie correct." *S.H.*, 336 F.3d at 270 (citing *M.M. ex rel. D.M. v. Sch. Dist. Of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002)). If the court displaces the hearing officer's factual findings, it must explain why and identify contrary nontestimonial extrinsic evidence in the record to support its finding. *Sch. Dist. of Philadelphia v. Williams*, No. CV 14-6238, 2015 WL 13873996, at *4 (E.D. Pa. Nov. 20, 2015). Within these standards, a district court may make findings based on the preponderance of the evidence and grant the relief it deems appropriate. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012). The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged. *Id.* at 270.

### IV. <u>RELEVANT LAW</u>

#### 1. **Free Appropriate Public Education**

Congress enacted the IDEA following its determination that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1); *see also L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). IDEA requires that states receiving federal funding under the statute have "policies and procedures to ensure that ... [a] free appropriate public education is available to all children with disabilities." 20 U.S.C. § 1412(a)(1)(A). For each child with a disability, "[a]n individualized education program ... [must be] developed, reviewed and revised." 20 U.S.C. § 1412(a)(4). The education of disabled students must, "[t]o the maximum extent appropriate," be provided "with children who are not disabled." Put differently, the child must be educated in the least restrictive environment that will provide him or her with significant learning. *See* 20 U.S.C. § 1412(a)(5)(A) ("[S]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."). In sum, FAPE is educational instruction specifically designed to meet the unique needs of a child with disabilities with sufficient support services to permit the student to meaningfully benefit from the instruction. *Bd. Of Educ. Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 203 (1982). However, there is no requirement that a state "maximize the potential of children with disabilities." *Id.* at 189–90.

## 2. Individualized Education Programs

The Individualized Education Program ("IEP") is the "central vehicle" for the collaborative process between parents and schools and the "primary mechanism" for delivering a

FAPE. *Ridley Sch. Dist.*, 680 F.3d at 269. Whether an IEP is appropriate is a question of fact. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). When parents challenge the adequacy of a child's IEP provided by the school district, a reviewing court must (1) consider whether the school district complied with the IDEA's procedural requirements, and (2) determine whether the educational program was "reasonably calculated to enable the child to receive educational benefits." *Id.* (citing *Mary T. v. Sch. Dist. of Philadelphia*, 575 F.3d 235, 249 (3d Cir. 2009)).

Compliance with the IDEA's procedural safeguards is indispensable to fashioning an appropriate IEP. *D.S.*, 602 F.3d 553 at 565 ("Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, as it did upon the measurement of the resulting IEP against a substantive standard."). The IDEA's procedural requirements are met where the child's parents or guardians "played a 'significant role' in crafting [the child's] IEP." *Id* (quoting *Schaffer v. Weast*, 546 U.S. 49, 53 (2005)). A procedural violation is compensable under the IDEA only if it results in a loss of educational opportunity for the student, seriously denies parents their participation rights, or causes a deprivation of educational benefits. *Id.*

Substantively, the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of his or her intellectual potential. *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir. 2009). To comply with the IDEA, the IEP must include an assessment of the child's current educational performance, articulate measurable educational goals, and specify the nature of the special services that the school will provide. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012). Importantly, "perfection is not required" in an IEP. *Loren F. v. Atlanta Ind. Sch. Sys.*, 349 F.3d 1309, 1312 (11th Cir. 2003).

In assessing the IEP, the Court must give deference to professional educators' opinion as to what constitutes an appropriate program for each student. *Ridley Sch. Dist.*, 680 F.3d at 277. "The court is not [ ] to substitute its own notions of sound educational policy for those of local school authorities." *Id.* (citations omitted).

### 3.   The Rehabilitation Act

Section 504 of the Rehabilitation Act mandates that " '[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination' under any program that receives federal funds." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012). Courts have explained that Section 504's 'negative prohibition' is similar to the IDEA's 'affirmative duty' and requires schools receiving federal financial assistance provide a FAPE to each qualified handicapped child who is in the recipient's jurisdiction. *Id.* (quoting *Ridley Sch. Dist.*, 680 F.3d at 280). As under the IDEA, providing a FAPE in accordance with Section 504 requires a school district to "reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Id.* Consequently, a finding that the District did not deny a student with a disability a FAPE is equally dispositive of that student's Section 504 claim.

### V.   <u>DISCUSSION</u>

Plaintiffs contend that the Hearing Officer erred by finding that the District provided Alec with FAPE while he attended school in the District because (1) the Hearing Officer's determination was based on tests that showed regression, not progress; (2) the reading program relied on by the District, Just Words, was incorrect; and (3) for the great majority of the time Alec attended school in the District, he was provided only minimal supports for a tiny fraction of

his later-identified disabilities. ECF No. 13 at 32–33. Plaintiffs assert that the District's evaluations and programming consistently failed to identify and appropriately meet Alec's pervasive needs and that the District provided inaccurate progress-monitoring data to the Parents.

The District counters that the Hearing Officer's finding that the District provided Alec a FAPE should not be disturbed because the District provided preponderant and compelling evidence at the administrative hearing and did in fact provide Alec a FAPE during his time attending school in the District. The District claims it provided a FAPE through IEPs that were reasonably calculated to provide meaningful educational benefit relative to Alec's potential. ECF No. 17 at 20–21.

The Hearing Officer found that the District provided Alec with FAPE during all the relevant period of time he was educated in the District. ECF No. 3-1 at 17. The Hearing Officer noted that when Alec came to the District in mid-fourth grade, he had been in "a parochial school that from kindergarten on either did not recognize the extent of [Alec]'s needs in reading or had been having difficulty addressing them." *Id.* Alec was behind and "there was a lot of catching up to be done." *Id.* The Hearing Officer found that the District provided special education services addressing Alec's defined area of need for the remainder of 4th grade. *Id.* At the beginning of fifth grade, the District placed Alec in Wilson's Just Words reading program after a process of evaluation and assessment, and thereafter applied the program with fidelity and continued to monitor the appropriateness of the program for Alec. *Id.* Further, the Hearing Officer observed that, as Alec's additional needs in writing and math emerged, the District addressed them in its programming. *Id.* The Hearing Officer found that Alec made meaningful progress over time. *Id.*

**A.  The Court Finds the Hearing Officer's Findings Are Supported by the Record**

Plaintiffs argue that the Hearing Officer's determinations should be overturned because the tests cited by the Hearing Officer showed not progress but regression. ECF No. 13–39. Specifically, Plaintiffs' cite that Alec's encoding and decoding performance in the Just Words program regressed from a Unit 3 level to a Unit 1 level; that Alec's reading fluency level decreased from fifth to fourth grade; that his reading fluency goal was lowered from a sixth grade level to a fourth grade level; and that, in reading comprehension, he went from proficient to below basic on his Lexile Score. *Id*.

The District counters that Alec made progress relative to his potential during his time in the District. ECF No. 17 at 39. The District claims the decision was made to have Alec review Unit 1 through Unit 3 of Just Words simply as a review, not because of lack of progress. *Id.* The District also claims it changed Alec's fluency goal from a sixth-grade level to a fourth-grade level because the goal was too high when it was initially set, and it was set that high due to the Parents' wishes. *Id.* Changing Alec's fluency goal was not due to any deficiency in the District's programming or lack of progress. *Id.* The District rejects Plaintiffs' assertion that Alec's drop in Lexile Score showed regression; rather, per the District, "It is common to see a drop in Lexile when moving from Read 180 to Achieve 3000, as the text for Achieve 3000 is nonfiction and more challenging." ECF No. 17 at 12. The District characterizes Alec's mixed scores in the AIMSweb data—a measure of reading fluency—as "an outlier." *Id*. at 31–32. According to the District, the AIMSweb data was only one piece of data that was used to monitor Alec's progress and was in fact the only data that did not show a consistently positive trajectory. *Id.* Further, Alec had a history of anxiety with timed tests that may have impacted his performance on the AIMSweb assessments and caused the results to not accurately reflect his abilities. *Id.* Additionally, as Alec had transitioned from 'learning to read to reading to learn,' fluency was no

longer as important to assessing Alec's reading abilities; far more important were his decoding accuracy and comprehension, which showed strong improvement. *Id.* at 32–33. While the District clearly does not accede to Plaintiffs' characterization of Alec's progress while enrolled in the District, it also asserts that progress is not the measure of an IEP's appropriateness. ECF No. 17 at 40. (citing *Colonial Sch. Dist. v. G.K. by & through A.K.*, No. CV 17-3377, 2018 WL 2010915 (E.D. Pa. Apr. 30, 2018) ("it cannot be determined whether an IEP was appropriate solely by evaluating a child's progress or lack of progress under that IEP")).

After the administrative hearing, the Hearing Officer found that Alec made "meaningful progress over time." ECF No. 3-1 at 17. The Hearing Officer detailed Alec's results on various assessments during his time in the District. ECF No. 3-1 at 7-8. These results include, for example, progression on Fountas & Pinnell assessments—a test of reading level—from a level M to Level U. *Id.* at 7. The Hearing Officer found that Alec gained 195 Lexile points in Sixth grade. *Id.* The Hearing Officer's findings do show that Alec's Lexile score decreased from 710 in June 2017 to 630 in Fall 2017, but also note that the texts for the Lexile tests changed from fiction to nonfiction at that point, which are more challenging. *Id.* The Hearing Officer also noted that Alec received good grades on his sixth-grade report cards, receiving an A in English/Language Arts, an A in Math, and a B in Science. *Id.* at 8.

Upon review of the record, the Court finds support for the Hearing Officer's factual findings and conclusion that Alec made progress relative to his potential during his time enrolled in the District. While there are scores that may show some regression, they do not undermine the Hearing Officer's judgment that on the whole Alec's performance improved. The burden was on the Plaintiff to persuade the Court to set aside the Hearing Officer's determination, which the Court takes as prima facie correct. *See Ridley Sch. Dist.*, 680 F.3d at 270 ("the party challenging

the administrative decision bears the burden of persuasion before the district court as to each

claim challenged"); *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270

(3d Cir. 2003) (treating the hearing officer's factual findings as "prima facie correct").

      The District has provided credible explanations for why some of Alec's scores were

lower than his parents might have hoped or might indicate some regression, and ample data to

support the Hearing Officer's findings. Further, while the IDEA requires that the District afford

Alec programming that would provide him a meaningful educational benefit, it does not require

that Alec maintain a record of consistent improvement. While the IEP must "aim to enable the

child to make progress," it is not necessary that the student never show any signs of regression or

stagnation. *K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018), *see also*

*Sean C. v. Oxford Area School District*, 2017 WL 3485880 (E.D. Pa. Aug. 14, 2017) (district

provided FAPE even though student made only "marginal" and "erratic" progress on his IEP

goals); *Kathryn F. v. West Chester Area School District*, 2013 WL 6667773 (E.D. Pa. Dec.18,

2013) (district provided FAPE even though student stayed on the same reading level for eight

months). To the extent Plaintiff's progress is relevant to assessing whether the District provided

Alec a FAPE, the Court holds that the Hearing Officer's findings regarding Alec's progress are

supported by the record.

      **B.  The Court Finds That Alec's Reading Program Was Reasonable**

      Plaintiffs next argue that the "Just Words" reading program relied on by the District was

incorrect. ECF No. 13 at 32. After noticing that Alec continued to struggle with reading, the

Parents asked the District to try a different, more intensive reading program than the Just Words

program the District was using—the Wilson Reading System. Dr. Lazar, the independent

evaluator, also recommended that the District switch to the Wilson Reading System. ECF No. 13

at 38. Plaintiffs argue that the District essentially admitted that Just Words was the wrong program by replacing it with the Wilson Reading System. *Id*. at 32–33. Plaintiffs believe this shows Alec needed that program from the start.

The District counters that its decision to place Alec in Just Words was appropriate. ECF No. 17 at 30. That decision was made by individuals with expertise in reading based on Alec's performance on standardized assessments and progress data. *Id.* The District also notes that the Wilson Reading System is much more intensive and restrictive than Just Words, so putting Alec in the that program when it was not clear it was the best program for him would have conflicted with the District's obligation to educate Alec in the least restrictive environment. *Id.* Alec's scores on several tests were too high to qualify for the Wilson Reading System. *Id*. For example, Alec earned a score of 89% in real words, meaning he already mastered 89% of what the Wilson Reading System would have addressed if he had been placed in that program. *Id.* While some of Alec's scores placed him in range for the Wilson Reading System, those areas of the assessment tested skills that were not yet addressed in Just Words, so the professionals working with Alec decided those scores did not justify a change in his reading program. *Id.* Further, many general education sixth-grade students have difficulty with some of the sounds Alec struggled with during testing. *Id.*

The Hearing Officer observed that the District chose Just Words for Alec as the most appropriate program at the beginning of his fifth-grade year, applied the program with fidelity, and continued to monitor the appropriateness of the program throughout Alec's time in the District. ECF No. 3-1 at 17. As Alec's additional needs in writing and math emerged, the District addressed those needs in its programing. *Id*. The Hearing Officer found that the evidence demonstrated that Alec made meaningful progress in reading over time. *Id.*

The Court finds no basis to overturn the Hearing Officer's conclusions on this issue. Fundamentally, Plaintiffs are asking the Court to second-guess the opinions and decisions of the education professionals who worked directly with Alec. This is not the role of the Court. "The choices made by school officials as to what constitutes an appropriate program for each student" are given "significant deference." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 277 (3rd Cir. 2012). This deference is based on the application of expertise and the exercise of judgment by school authorities. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017). Deference is conditioned on these authorities being able to offer cogent and responsible explanations for their decisions (*id.*), which the District has done here. The District cites ample evidence to support the choice to place Alec in the Just Words program. Alec's testing was within the range for both programs, and those professionals made the judgment that Alec would benefit more from Just Words because the Wilson Reading System was too restrictive and too remedial. The Hearing Officer agreed.

The Court cannot properly displace these judgments and impose its own. Plaintiffs acknowledge that Alec's scores were "on the cusp between Wilson and Just Words." ECF No. 13 at 37–38. That other professionals would have acted differently and that the District ultimately changed Alec's program does not to persuade the Court to hold otherwise. The Court also will not find that the District changing Alec's programming to the Wilson Reading System constitutes an admission that his original placement was incorrect. The District has an obligation under the IDEA to consistently monitor a disabled student's progress and modify its programming as appropriate; to find that changing a program amounts to an admission would hamstring a district's ability to adjust its supports to meet a student's changing needs and undermine the IEP process. *See* 20 U.S.C. § 1414(d)(1)(A)(4) ("The local educational agency

shall ensure that … the IEP Team … revises the IEP as appropriate"). That the Parents asked for Alec to be placed in the Wilson Reading Program does not mean the District failed to meet its IDEA obligations by keeping Alec in Just Words. *See Parker C. v. West Chester Area School District*, 2017 WL 2888573 (school districts are "not required to provide a specific program or employ a specific methodology requested by the parent").

### C. The Court Finds That Alec's IEPs and the Supports Provided to Alec by the District Were Adequate

Plaintiffs claim Alec's IEPs generally contained inadequate present education levels, inappropriate goals which failed to appropriately address all of Alec's needs, and insufficient means of monitoring progress. To support their claim that Alec's IEPs were inadequate, Plaintiffs cite that the IEPs in place for Alec during fourth and fifth grade included no goals related to basic reading skills despite the fact that the District's assessments showed that Alec had a specific learning disability in basic reading skills. ECF No. 13 at 33. It was only in the middle of Alec's fifth-grade year that District added a fluency goal. *Id.* at 34. At the end of Alec's fifth-grade year, the District added decoding and encoding goals. *Id*. Plaintiffs also assert that the specially designed instruction and supports included in the IEPs at issue were minimal at best and typically included the same handful of approximately eight accommodations, which were not individualized to Alec. ECF No. 13 at 34. Alec's IEPs in fourth through sixth grades failed to include any goals or direct instruction in executive functioning skills.

The District claims it provided a FAPE through IEPs that were reasonably calculated to provide meaningful educational benefit based on Alec's potential. ECF No. 17 at 34. The District argues that the Parents' claims about Alec's IEPs are unsubstantiated, as they are supported only with general statements and not specific cites to the record. *Id.* The District asserts that Alec's IEPs addressed all his areas of identified need and were specific and individualized. *Id*. Alec's

IEPs provided for direct instruction in reading in both basic reading skills and comprehension by certified reading specialists daily. *Id*. He was provided instruction using a research-based writing program targeted to improving his writing skills. *Id.* He was provided additional support in math to address gaps in skills formed prior to entering the District. *Id.* The District claims it was responsive to Alec's needs and reviewed data regularly. *Id.* While the District may have changed Alec's fluency goal at the end of fifth grade, that change did not impact Alec's programming and Alec's sixth-grade teachers identified quickly that this goal needed to be changed. *Id.* at 35.

In fifth grade, Alec's needs were addressed through direct instruction in a research-based reading program. ECF No. 17 at 35. While his fifth grade IEP did not include a goal for basic reading, his needs were addressed through programing and monitored through the reading program. *Id.* A reading goal was added in Alec's December 2016 IEP. *Id.* When the District realized Alec did not have a reading comprehension class in sixth grade, it quickly added it. *Id.* Throughout Alec's time in the District, Alec's reading courses were all taught by certified reading specialists to a small group of students. *Id.* These programs did not isolate or separate Alec from his peers, and Alec received direct instruction with research-based targeted intervention tools daily. *Id.*

Plaintiffs claim that the District provided inaccurate progress-monitoring data to the Parents. ECF No. 19 at 17. However, the Plaintiffs do not provide adequate support for that statement. Plaintiffs allege that the data collected at the end of Alec's fifth grade year erroneously suggested that he was making meaningful gains and was on grade level in reading, when, in fact, Alec was several years below the reading levels that the District reported to the Parents. ECF No. 13 at 5, 9. Specifically, at the June 2017 IEP meeting, the Parents were informed that Alec was in Unit 3 (of 14 units) of Just Words, was able to read 130 words

correctly per minute on a fifth-grade level, had a comprehension Lexile Score of 710 (which is proficient at a fifth-grade level), and was reading on a level U in Fountas & Pinnell, which correlates to a middle fifth-grade level. ECF No. 13 at 9. According to Plaintiffs, the Parents discovered that data was inaccurate when the District collected accurate data and presented it to the Parents at the beginning of his sixth-grade school year.

At the start of Alec's sixth-grade year, he underwent baseline assessments in reading and it was determined that his reading levels were "considerably lower." ECF No. 13 at 10. That data revealed that Alec was reading approximately 129 words per minute on a fourth-grade level, and only 93 words per minute at a fifth-grade level. 3-32 at 19. His Lexile Score was 630, which is "below basic," rather than 710. ECF No. 13 at 5; ECF No. 3-32 at 19. The only evidence Plaintiffs cite for their claim that the fifth-grade data was inaccurate is that Alec's scores were lower at the beginning of sixth grade. That Alec's scores decreased—particularly after being out of school on summer vacation for several months—is not strong evidence that the data collected by the District and communicated to the Parents was inaccurate.

The District points out that the Parents have inferred—without support—that because Dr. Lazar identified additional needs, those needs were present and unknown throughout Alec's time in the District. ECF No. 22 at 10. The Court agrees, and finds that Plaintiffs' claim is not supported by the record. The Hearing Officer found that before the independent evaluator suggested a speech/language evaluation because seventh-grade work would be more difficult, neither the District nor the Parents had previously noticed any weakness in that area. ECF No. 3-1 at 18. In October 2015, the District performed assessments and found that Alec was not eligible for speech and language services. *Id.* at 2, 37. In fifth grade, Alec did not present with attentional needs or any emotional concerns, participated in class, asked for help when necessary, and began

working more independently without prompting. ECF No. 17 at 7. The District pointed out that in sixth grade, Alec's teachers reported that Alec had a positive rapport and relationships with his peers and was well liked. *Id.* at 13. While his initial evaluation report noted that Alec was distractible, his IEPs at the time addressed that issue by providing some supports for executive functioning, including verbal and visual cues to return to task and maintain attention, visual reminders to check math operation symbols, instructions repeated as necessary, and use of private office for privacy and focus. *Id.* at 37–38. That these supports were included in the IEP does not indicate to the Court that Alec had severe needs that were unmet or underserved. That a child of that age would struggle mildly with concentration seems appropriate to his or her development at that age, and not a clear signal to the District that Alec had unmet needs.

The record suggests that Alec's needs likely changed over time, not that Alec had additional needs that were undiagnosed and unmet by the District. The Plaintiffs do not identify any nontestimonial, extrinsic evidence in the record would justify a contrary conclusion. Further, that there may have been some omissions in Alec's IEPs would not render them legally inadequate. *Coleman v. Pottstown*, 581 F. App'x 141 (3d Cir. September 15, 2014) (omission of certain goals and services in the IEP did not result in a denial of FAPE where there was evidence student received adequate instruction).

Plaintiffs again argue that the District "effectively admitted" it was providing Alec only minimal supports that did not meet his needs by adding more specially designed instruction and supports to his seventh-grade IEP. ECF No. 19 at 16. The Court again rejects the idea that changing Alec's IEPs amounts to an admission that earlier IEPs were inappropriate. The IDEA clearly requires that schools and districts consistently monitor students' progress and adjust

supports accordingly (*see* 20 U.S.C. § 1414(d)(1)(A)(4)); the Court will not make any negative inferences against the District based on changes to Alec's IEPs or programming.

Plaintiffs claim that the District "outrageously" blames Sheila G. for the inclusion of the sixth-grade fluency goal in Alec's IEP at the end of fifth grade and that the Hearing Officer "incredibly" blamed the Parents for requesting that Alec's reading goal be written to a sixth-grade level. ECF No. 19 at 5–6; ECF No. 13 at 40. However, this brazenly mischaracterizes the District's statements and Hearing Officer's conclusions. The District simply noted that the IEP members revised Alec's reading fluency goal at the Parents' request. ECF No. 17 at 6. Further, nothing in the Hearing Officer's decision suggests that there were any deficiencies in Alec's IEPs caused by Sheila G.'s desire to change Alec's fluency goals. The Hearing Officer specifically observed that, "The Parents' desire to help their child achieve grade and age-level reading proficiency as well as proficiency in other subjects is completely understandable and their efforts toward their expectations are admirable." ECF No. 3-1 at 17. Nothing in the District's or the Hearing Officer's statements "blame" Sheila G.

Plaintiffs further argue that it is not appropriate to cite Sheila G.'s request to change the fluency goal as a defense to modifying it later because the District had a non-delegable duty to conduct proper evaluations and provide appropriate goals. ECF No. 19 at 5. While it is correct that the District had a non-delegable duty, Plaintiffs' claim here ignores the IDEA's requirement that parents collaborate in the IEP decision-making process. *See* 20 U.S.C. § 1415(b)(1) (providing parents must be given an opportunity to examine all records relating to the child and participate in meetings with respect to placement and FAPE). There is nothing inherently problematic about an element of IEP changing at a parent's request, just as changing an IEP goal does not prove that the original goal was wrong or that the IEP was legally deficient. Further,

even if the inclusion of the sixth-grade level fluency goal was an error that was entirely the fault

of the District, that still would not mean that Alec was denied a FAPE. "Perfection is not

required" in an IEP. *Loren F. v. Atlanta Ind. Sch. Sys.*, 349 F.3d 1309, 1312 (11th Cir. 2003).

One flawed goal clearly does not render Alec's IEPs and supports legally inadequate.

Plaintiffs cite a myriad of other facts—including Alec's decrease in self-esteem in sixth

grade and his difficulty adjusting to a new building and schedule—to support their claim that the

District was not appropriately meeting Alec's needs. *See* ECF No. 19 at 6–8. Unfortunately, none

of these are legally significant. Plaintiffs emphasize that in sixth grade Alec struggled with

changes in his schedule and adjusting to a new building, and would continue to struggle if he

remained in the District as he would need to change to "a ***different*** building for seventh and

eighth grades, with yet ***another*** move on the horizon to the high school." ECF No. 19 at 6–7

(emphasis in original). However, it is unclear how this applies to the FAPE standards, how the

Plaintiffs propose this be addressed, and how the District failed in any regard. It is especially

confusing given that Plaintiffs then go on to claim that Alec was in fact given too much remedial

instruction, such that it negatively impacted his self-esteem and made him feel different from his

peers. *Id.* at 7. Plaintiffs appear to be arguing both that Alec should have been placed in a

hypothetical separate school for the entirety of his K-12 education that did not require building

changes after fifth grade, sixth grade, or for high school, *and* that Alec needed to be treated more

like other students without disabilities. Ultimately, neither of these contradictory points supports

the claim that Alec was denied a FAPE.

The Hearing Officer found that Alec made meaningful progress while enrolled in the

District, that the District monitored Alec's needs and provided him appropriate supports. ECF

No. 3-1 at 16. As Plaintiffs have not persuaded the Court that these findings are contradicted by

the record, the Court holds that Alec's IEPs were reasonably calculated for him to make meaningful progress relative to his potential and so complied with the IDEA, that the supports provided by the District were legally adequate, and that Alec was provided a FAPE.[2]

## VI.  REMEDIES

### A.  Compensatory Education

Compensatory education is an equitable remedy, designed to place disabled children in the same position they would have occupied but for the school district's violations of IDEA. *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990). Compensatory education may be awarded when a district knew or should have known that a child was receiving no benefit or just trivial benefit from the child's educational program and placement. *M.C. v. Central Regional Sch. Dist.*, 81 F.3d 389 (3d Cir. 1996). A compensatory education award should compensate the child for the deprivation of a FAPE, minus a reasonable period for the school district to rectify the deficiency it knew or should have known existed. *Id.* Having found that a deprivation of FAPE occurred, a hearing officer may consider what level of compensatory education is needed to restore the student to the level of attainment the child would have reached but for the district's deprivation. *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 (3d Cir. 2015); *see also*, *B.C. v. Penn Manor Sch. Dist.*, 906 A.2d 642 (Pa. Cmwlth. 2006).

The Hearing Officer found that the District had provided Alec with FAPE during the relevant period of time Alec was educated in the District and therefore no compensatory education was due. ECF No. 3-1 at 17. As the Court agrees with Hearing Officer's finding that Alec was provided FAPE, as discussed above, no compensatory education will be awarded.

---

[2] Because Plaintiffs have failed to prove their claims under the IDEA, they have also failed to prove their Section 504 claims. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012). Accordingly, the Court does not address the Section 504 claims.

**B. Tuition Reimbursement**

Plaintiffs have also sought tuition reimbursement for Alec's 2018-2019 enrollment at the Delaware Valley Friends School. Under the *Burlington-Carter* test, parents have a right to receive tuition reimbursement only when (1) the District fails to offer FAPE, (2) the private school selected by the parents is appropriate, and (3) relevant equitable considerations favor reimbursement. 471 U.S. 359, 374 (1985). A decision against the parents at any step of that process results in a denial of reimbursement. *Florence County Sch. Dist. v. Carter*, 510 U.S. 7 (1993); *Burlington Sch. Comm. v. Dept. of Educ.*, 471 U.S. 359 (1985).

The Hearing Officer found that the District's IEP offered to Alec for his seventh-grade year was more than just appropriate, it was excellent, and that Parents were not entitled to tuition reimbursement. ECF No. 3-1 at 17. The Hearing Officer observed that Alec's seventh-grade IEP addressed Alec's areas of need with appropriate goals and provided an array of specially designed instruction to meet Alec's learning style and weaknesses. *Id*. at 17–18. While the Parents believed that the IEP was inadequate because Alec would be best served in an educational environment that integrated literacy needs within the academic curriculum and allowed Alec to have more similar programming to his classmates, this disapproval does not mean that the seventh-grade IEP would not have provided Alec with a FAPE. As the Hearing Officer correctly observed, the IDEA does not guarantee that a child receives the best program, only that the program be appropriate. *Id.* at 18.

Plaintiff argues that the August 13, 2018 IEP did not offer Alec a FAPE. Plaintiffs note that the IEP provided for two separate and distinct programs/methodologies to address reading and reading comprehension, rather than integrating his literacy needs within and throughout all components of the academic curriculum, as Dr. Lazar recommended. ECF No. 13 at 48. The IEP

22

also required that Alec forfeit electives and core academic classes to receive the programming and supports offered by the District. *Id.* Plaintiffs also speculate, without providing any basis, that the regular education teachers would not be able to implement the specially designed instruction and supports in the proposed IEP in regular education classes with roughly 25 students per class. *Id*. at 49.

The Court agrees with the Hearing Officer's conclusion. As the District outlines, the IEP for Alec's seventh-grade year provided ample services and supports, measurable annual goals in all areas of Alec's assessed disabilities, consistent progress monitoring, and regular communication with the Parents. Alec was to receive instruction from certified reading specialist in a small group of no more than four to five students daily for 49 minutes. ECF No. 17 at 42. Alec was also to continue in the Reading Comprehension Course, where he would receive direct instruction in reading comprehension in a research-based reading program. *Id.* The IEP provided that Alec would receive writing support in the Writing Lab, which would have had about five to seven students and instruction would have been provided by a special education teacher from a research-based program. *Id.* The IEP also offered additional support in math and direct instruction in speech and language by a speech and language pathologist. *Id.* at 42–43. The IEP included measurable annual IEP goals to address needs in basic reading, reading fluency, reading comprehension, executive functioning, speech and language, and written expression. *Id.* Alec would also have received direct instruction on executive functioning skills from a special education teacher and counseling with a guidance counselor to help Alec manage his anxiety. *Id.* The IEP also contained a long list of accommodations to support Alec's needs: extended time on tests, preferential seating to ensure focus, supportive reading comprehension strategies, movement breaks, hands-on learning opportunities, questions in advance to help prepare for the

lesson, practice and generalization of decoding skills in all classes, and chunking all assignments. *Id.* at 43. Contrary to Plaintiffs' assertion, the District claims that Alec would have had opportunities participate in enrichment and extracurricular activities. *Id.* The District also disputes that Alec's classroom teachers would not have been able to provide the IEP supports, stating that Alec's IEP provided for co-taught support classrooms for math and English, which would be taught by both a regular and a special education teacher. *Id.* at 44–45. The Hearing Officer found that this IEP was reasonably calculated to provide a meaningful educational benefit based on Alec's potential, and the Plaintiffs have not brought forth sufficient evidence for the Court to hold otherwise. Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court or the parents regard it as ideal. *K.D. v. Downingtown Area Sch. Dist*., 904 F.3d 248, 255 (3d Cir. 2018). This IEP was clearly reasonable, that it was not the Parents' ideal does not render it legally inadequate.

As the Plaintiffs have not satisfied the first requirement of the *Burlington-Carter* test, the Court will not address whether the Delaware Valley Friends School was an appropriate placement for Alec or whether the equities favor reimbursement.

### C.  Reimbursement for Private Speech/Language Evaluation

The Parents' right to an independent evaluation at public expense is established by the IDEA and its implementing regulations. 34 C.F.R. § 300.502(b)(l) ("A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency."). However, compliance with the regulatory process is necessary. The Parents were required to first request the independent educational evaluation at public expense, after which the District could have either filed a due process complaint to request a hearing on the request or agreed to the evaluation at public expense. 34 C.F.R. § 300.502(b)(2).

The Hearing Officer held that the District was not required to reimburse the Parents for the private speech/language evaluation they obtained from their family friend. ECF No. 3-1 at 18. The Hearing Officer stated that the Parents could have requested that the District complete a speech/language evaluation, or alternatively asked that the District fund an independent evaluation. *Id.* By not first requesting the evaluation from the District, the Parents willingly assumed the responsibility for the evaluation. *Id.* As Plaintiffs have not brought forth any facts demonstrating their compliance with these regulations, the Court will uphold the Hearing Officer's determination.

**VII. <u>Conclusion</u>**

As the Court finds that the District provided Alec with a FAPE during the time he was enrolled in the District, the Court will deny Plaintiffs' Motion for Judgment on the Administrative Record. An appropriate order follows.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**